**Estate of Lou Fushanis, Deceased, Appellee, v. Jeanne Poulos, Claimant-Appellant.**

**Gen. Nos. 51,419 and M–51,614. (Consolidated.)**

First District, First Division.

June 30, 1967.

Haft, Shapiro & Haft, of Chicago (Morris A. Haft, of counsel), for appellant.

Gregory A. Gelderman, guardian ad litem, and Edward L. S. Arkema, for administrators, of Chicago (Gregory A. Gelderman, of counsel), for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

Jeanne Poulos, claimant against the estate of Lou Fushanis, her deceased brother, appeals from an order which dismissed her fifth class claim for $11,870. The record indicates the estate is insolvent. No evidence was offered on behalf of the estate.

Lou Fushanis died in Chicago, Illinois, and left surviving him a widow and two children; also, his mother and his sister, the claimant. During his lifetime, he either

owned or operated approximately 1,000 parcels of real estate through the use of various corporations and partnerships. He invested money for many persons, and his records primarily consisted of individual account cards and ledgers. The account cards contained the account number, the amount of money that was originally paid in, the monthly payments, and the balance due.

Shortly after David Zaransky's appointment as co-administrator of the estate of Lou Fushanis, he permitted the claimant to examine decedent's books and records. There were six cards bearing the name of Jeanne Poulos and a master card, all of which were lost or misplaced by the representatives of the estate before the hearing of the claim. The claim of Jeanne Poulos (hereinafter set forth) was prepared under the direction of Zaransky and from books in her possession.

"Claimant (Jeanne Poulos) did heretofore deliver to the deceased funds to be held specifically in trust for claimant's benefit in the following amounts:

| Account No. | Original Amount | Monthly Payments | Balance Due |
|---|---|---|---|
| 155 | 2000.00 | 40.00 | 960.00 |
| 17 | 2000.00 | 40.00 | 1520.00 |
| 33 | 2000.00 | 40.00 | 1200.00 |
| 105 | 2000.00 | 40.00 | 1660.00 |
| 62 | 2000.00 | 40.00 | 1480.00 |
| 112 | 10000.00 | 125.00 | 5050.00 |

That for a period of time last past said Lou Fushanis, deceased, did from time to time make payments to reduce the trust indebtedness leaving balances due as indicated hereinabove. That the said funds were at all times treated by the decedent as trust funds and were accepted by Lou Fushanis, deceased, specifically as trust funds, and accordingly your claimant represents that said total of $11,870.00 as indicated above should in view of the facts and

circumstances be allowed and preferred over all other general creditors, and that an order be entered directing the co-administrators to treat said claim as a trust fund, and that the said co-administrators be directed as moneys become available to pay said claim in such installments as shall be ordered by the Court and as said funds accrue."

At the hearing of the claim, Zaransky testified both as an adverse witness and as a witness for claimant. Although a subpoena had been served upon him to produce "Books, record cards, account records numbered 155, 17, 33, 105, 62 and 112 kept by the decedent during his lifetime," no estate records were produced. Zaransky related in detail the preparation of the claim, and that it set forth the amounts "exactly as they were in the booklets she had."

Under cross-examination by the attorney for the estate, Zaransky stated, "I verified the balances due against the account numbers, and I saw these cards which indicated the name of Jeanne Poulos, the account number, the amount of money paid in, the amount of loan, no interest, or interest included, I am not sure, the amount of monthly payments and the balance due." In reply to a question as to whether the amounts shown as received on the cards were actually received, the witness stated, "The account card indicated that the original amounts on the opening entry were the same as the claim, but the amount paid in was less. . . . It appeared from my examination that Mrs. Poulos sent to her brother moneys that he accepted and entered, and opened an account card for double the amount that she sent him, and indicated payment of so much per month, with no interest, or waiving of the interest, I am not sure again as to the exact term it set at that time. . . . It is very difficult for me at this time to testify that it is exactly true on each one (the six accounts)." He stated it was true on several of the ac-

117

counts, but that he did not know "of his own personal knowledge this was actually done."

When the claim was being prepared, the cards were in the estate office, and he had access to the cards. After he examined the account cards, "they were supposedly put back in the files, and I haven't seen them since." As to the books of Mrs. Poulos from which he secured the data for the claim, he stated "they were either returned to Mrs. Poulos or they were misplaced."

A witness for claimant, Betty Smith, an employee of decedent since 1959 and his secretary at the time of death, testified in detail as to the bookkeeping practices of the decedent and the keeping of cards which contained "names, addresses, and they showed the transaction, what type of transaction it was." She saw cards which bore the name of Jeanne Poulos, on which "it said 'Jeanne Poulos, trust loan accounts.' It gave the numbers and it gave the date that the payments were to go out and the amounts." She further stated that she didn't see the words "trust or trust account" on any of the other cards in the office. Decedent told her that "Jeanne sent him this money, so that he could keep it for her and because her husband had been sick. . . . [H]e would be sure that she had money, because he never did know when her husband would be able to work or wouldn't be able to work, and he wanted to be sure that she had money, because she had a lot of children . . . ."

On cross-examination, Miss Smith stated she did not know whether the amounts received were the amounts entered on the cards, that when decedent would receive a check from his sister he would tell her the total amount to be put on the card. If he received $1,800, it might be $2,300 on the card. If the claimant sent her brother a check for $1,000, "he would tell me so much money, maybe it was $2,000 maybe it was $1,800." The witness further testified that when the decedent received checks from his sister, they were not deposited in the decedent's

118

regular account but in the Happy Builders Account, out of which account he paid bills and used it for his personal use and made mortgage payments out of it. When monthly payments were made to claimant, they were paid out of the Happy Builders Account.

Another witness for claimant, Vito Theodore, who was in the employ of decedent at the time of his death as office manager, testified that he was in charge of the books and knew the system used by the decedent in his financial transactions, which were kept on a series of cards. There were a couple of hundred in number and disclosed all of his transactions with other people. "We would take notes, keep a record of contractors that did work for us, we would loan them money." He stated, "I don't know exactly how many cards there were that bore Jeanne Poulos' name, but the cards said 'Letter of trust loan accounts, Jeanne Poulos.' One card had all the transactions, then other cards had due dates and amounts. . . . there were separate cards which showed the individual amounts of money." He said, "I spoke with the decedent about these cards from time to time, and he told me that I guaranteed to give my sister all her money and take care of her kids and put them through college and that was the end of that. He mentioned the word trust in connection with Jeanne Poulos' accounts, and I thought he was protecting himself under a 'trust'; he said that if at any time his sister wanted her money, she could send him a letter and he would give it to her all in cash; that he was using her money and was charging high interest on it. . . . to my knowledge he never asked his sister where to put the money; he put the money wherever he wanted to." He further stated that he did not know how much money was given by claimant to decedent at the time the card entries were made. Money that came into the office was deposited by decedent in the "Happy Builders Account," and he would transfer

119

from that account into a number of other bank accounts which decedent maintained in other names.

Claimant testified in her own behalf as to events which occurred after the death of her brother. She went to the office of the decedent two days after his death and checked his records. The records she saw consisted of one main card, and "that card had my name, Jeanne Poulos, my address in Florida, and it had 'trust account,' and it had all the numbers of the various accounts listed on the front of it." She testified there were about six account numbers and "these cards . . . had figures on there, how much we started with, and how much he was sending me and how much was deducted. Well it had the whole transaction."

On cross-examination, claimant affirmed that the claim filed by her contained "those same amounts on the cards that you stated that you examined in the estate office." She was further questioned, "Is this, these sums as listed in this exhibit (the claim) the actual amount that you sent to Mr. Fushanis, or are these the increased amounts?" She replied, "All I know is that that is what I sent. What he did, I don't know how he handled it. That is what I sent my brother." She further stated that the amount of her claim was for "the amounts you also found on the cards."

The court received in evidence a copy of a letter dated December 23, 1963, addressed to the attorney for the estate and written by Zaransky, in which it is said, "Per our conversation, I have examined the personal records of Lou Fushanis, and find that he held in trust for his sister, six accounts. . . . The personal records of Lou Fushanis clearly indicate no interest." The letter set forth the account numbers, original amount, monthly payments, and balance due, all of which are included in the claim.

The court refused to receive in evidence a letter dated October 31, 1956, addressed to claimant, which closed

with a typewritten name "Lou Fushanis," above which appeared in handwriting "Lou." The witness Betty Smith, identified the handwriting as that of the decedent, but she was not familiar with the letter. The letter requested claimant to send him $5,000, and related details as to previous investments. The letter further stated, "The plan I have for you is to liquidate all your present deals you have with me and reinvest all the money and you will be the beneficiary under a Trust. In short, I want to secure your money with property which you can control by yourself. *I will be responsible for the management* and the *safety* of *your funds*. I will cash you out if you ever have need for the money. . . . All your new deals will be in trust with you as a beneficiary if you own the entire Trust. If you and I are partners, we each have a one-half undivided interest in the Trust and the Power of Direction is vested in both of us and both our signatures are required for anything we wish to do. . . . After the Trusts are set up, I will send you a Will to sign that will protect the children. The deals you had now were short term. The new ones will be long term and if you do not touch the returns and reinvest once a year, by the time your children are grown, you will be wealthy."

It is claimant's theory that the various sums of money which she deposited with her brother were to be held in trust for her "solely for the purpose of investment and reinvestment thereof"; that "the monies so deposited were in the nature of trust funds and were monies and properties received or held in trust by the decedent which cannot be identified or traced"; and that "the proof made by the claimant was sufficient to establish a claim of the 5th Class."

It is the theory of the coadministrators and the guardian ad litem for the minor children of the decedent that "the claimant has failed to prove, by a preponderance of the evidence, that her deceased brother, Lou Fushanis, was indebted to her at the date of his death in the amount

of her claim," and "if this court should be of the opinion that an obligation was owed by the decedent in the amount of the claim, that the evidence does not warrant or justify allowing the claim as a claim of the Fifth Class. The refusal of the claimant to change her claim from that of the Fifth Class and her insistence that it be allowed as filed or not at all, gave the court no alternative but to dismiss the claim with prejudice."

Initially, it is reasonable to infer that it is not disputed that Jeanne Poulos has a claim against the estate of the decedent. The questions are (1) the amount, and (2) its classification.

 In considering the evidence offered by plaintiff in support of her claim, the controlling guidelines to be used here are those covering "written admissions or declarations against interest" and the "admission of secondary evidence." As to "written admissions," entries or memoranda made by decedent against his interest, found in his books or papers, are, in general, admissible against his estate in favor of a party seeking to establish their truth. (Patten v. Knowe, 354 Ill 156, 161, 188 NE 173 (1933) ; Sidwell v. Sidwell, 75 Ill App2d 133, 140, 220 NE 2d 479 (1966).) As to "secondary evidence," 18 ILP, Evidence, § 101, states the rule to be that to introduce secondary evidence of a writing, a party must first prove its existence, genuineness, and loss or destruction, and his own due diligence in attempting to procure it. Claimant's evidence as to the records of the decedent meets these requirements and may be properly considered in the determination of the merits of her claim.

 As to the amount, it is apparent that although the claim was prepared from the books of the claimant, it was verified by the coadministrator with account cards in the office of the decedent before they were lost or misplaced. Also, Betty Smith, decedent's secretary, testified that the entries and the amounts on the cards were made

122

at decedent's instruction. Notwithstanding the testimony of both Zaransky and Betty Smith, which indicates that in some instances decedent increased the amount received from his sister and recorded a larger amount on the account card, the witnesses were unable to identify any part of the instant claim as being a transaction of that nature. The claimant, while under cross-examination by the estate, testified that her claim was for the amount sent her brother.

The testimony of Zaransky and Betty Smith, as to the practice of decedent of increasing the amounts sent him by claimant, was inconclusive and was offset by the statement of claimant that the account cards reflected the amounts sent by her. If the records of the estate contained any information which militated against the amount claimed by claimant, it was the responsibility of the representatives of the estate to produce the cards to offset and reduce the amount claimed by her. In the absence of the production of the account cards by the estate, and in view of the inconclusive testimony on this point, the claim should have been allowed for the full amount asserted thereon.

We next consider the question of whether the proof made by claimant was sufficient to establish a claim of the fifth class. Section 202 of the Probate Act (Ill Rev Stats, c 3) directs the classification of all claims against the estate of a decedent, and the fifth classification is "money and property received or held in trust by decedent which cannot be identified or traced." In Schaack v. Reiter, 372 Ill 328, 23 NE2d 714 (1939), the Supreme Court considered at length the classification of fifth class claims where the claims against the estate exceeded the assets, so that the general claimants received but a small percentage of their claims. There, the court said (p 331):

"It was held in Wilson v. Kirby, 88 Ill 566, that the words 'in trust for any purpose' were not inclusive of every case where money or property had come into the possession of a person by reason of a confidence or trust reposed. In the broadest sense of the term it would include factors, agents, etc., but it was used in a restricted sense and referred only to special or technical trusts, and did not include those which the law implies from the contract. . . . This character of trust arises from the direct and positive action of the parties. Those actions may be evidenced by written instrument, words expressed, or both. One of the essential elements to the creation of such a trust is the intent of the parties. Before there can be an express or technical trust, there must be proof of circumstances which clearly evidences an intention to create a trust. . . . The mere relationship of debtor and creditor or of principal and agent, does not furnish a basis for the establishment of a trust of the character contemplated in section 70 of the Administration act."

And on p 333:

"In determining whether the parties intended to create an express or technical trust, we may look to their acts in the management and payment of the funds as well as to the receipt which was issued. The method adopted by the parties in dealing with the funds clearly negatives any intention to create a trust. The Appellate Court properly classified the claim as of the sixth class."

In the foregoing case, Justice Gunn dissented and said (p 334):

"The writing set out in full and signed by Reiter includes all the elements of an express trust. It specifies a property, the name of the beneficiary and

her interest and the manner in which the trust is to be executed. We have held an instrument in writing, including the foregoing, creates an express trust. . . . In Marble v. Estate of Marble, 304 Ill 229, quoting from Perry on Trusts the court, on page 240, says: 'In section 82 it is said that "there is no particular formality required or necessary in the creation of a trust. Any agreement or contract in writing made by a person having power of disposal over property, whereby such person agrees or directs that a particular part of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement, or any other person claiming under him, voluntarily or with notice." ' The fact that Reiter, prior to delivering the writing, had been in possession of a larger sum belonging to appellant, which had been treated between them as a loan, is not material as it was competent for the parties to change that situation and bring into effect the trust relationship by the giving and acceptance of the instrument in question. This writing established the trust relationship and the burden is upon the trustee to discharge it. . . . There is nothing in the record that indicates appellant waived the rights she acquired by the writing or that she had information that Reiter had not invested the money in a first mortgage as specified. Reiter recognized the importance of the paper he delivered by requiring it to be surrendered when he delivered the mortgage or mortgages. It is not the law that a trust relationship declared in writing, can be discharged by the actions of the trustee alone. . . . With nothing in the record to establish that appellant knew how Reiter was handling the funds, she

had a right to assume that he had invested it in a first mortgage as he had agreed."

After examining this record in the light of the foregoing pronouncements in Schaack v. Reiter, 372 Ill 328, 23 NE2d 714 (1939), we conclude that claimant's evidence is sufficient to classify her claim as of the fifth class. Betty Smith testified that the cards stated "Jeanne Poulos, trust loan accounts," and she did not see the words "trust or trust account" on any other cards in the office. Vito Theodore testified that the cards said "Letter of trust loan accounts, Jeanne Poulos," and stated that the decedent mentioned the word "trust" in connection with Jeanne Poulos' accounts. The foregoing is buttressed by the letter of October 31, 1956, written on stationery used by decedent and addressed to claimant, which closed with a typewritten name "Lou Fushanis," above which appeared in handwriting, "Lou." Betty Smith identified the handwriting as that of the decedent. The trial court should have received it in evidence because it was a written communication passing between the claimant and the decedent which was relevant to the issues of her claim. The genuineness of the signature of the decedent was proved and its delivery to claimant may be presumed from the fact that it was in her undisputed possession at the time of his death. 29 Am Jur2d, §§ 878, 879.

For the reasons given, the order of the Circuit Court dismissing the claim of Jeanne Poulos with prejudice is reversed, and the cause is remanded to the Circuit Court with directions to allow the claim for the sum of $11,870 and as of the fifth class.

Reversed and remanded with directions.

BURMAN and ADESKO, JJ., concur.